# 21-2556

(SDNY Docket No.: 1:20-cv-04658-RA)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

MARIBEL MOSES,

on behalf of herself and all others similarly situated,

Plaintiff-Appellee,

vs.

THE NEW YORK TIMES COMPANY, d/b/a The New York Times,

Defendant-Appellee;

ERIC ALAN ISAACSON,

Appellant

---

Appeal from the United States District Court
for the Southern District of New York, No. 1:20-cv-04658-RA
Hon. Ronnie Abrams

## APPELLANT'S PETITION FOR REHEARING AND FOR REHEARING EN BANC

Eric Alan Isaacson
Law Office of Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037
(858) 263-9581
ericalanisacson@icloud.com

# CORPORATE DISCLOSURE STATEMENT

Eric Alan Isaacson is a natural person.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ...................................................................... iii

I.     RULE 35(b)(1) STATEMENT ......................................................... 1

II.    QUESTION PRESENTED ............................................................... 2

III.   STATEMENT OF THE CASE ......................................................... 4

IV.   ARGUMENT ..................................................................................... 6

V.    CONCLUSION ................................................................................ 15

# TABLE OF AUTHORITIES

**CASES**

*Alyeska Pipeline Serv. Co. v. Wilderness Society,*
    421 U.S. 240 (1975)............................................................2

*Amchem Prod., Inc. v. Windsor,*
    521 U.S. 591 (1997)..........................................................14

*Boeing Co. v. Van Gemert,*
    444 U.S. 472 (1980)........................................................2, 6-7

*Central R.R. & Banking Co. v. Pettus,*
    113 U.S. 116 (1885)…………………………………………….*passim*

*In re Dry Max Pampers Litig.,*
    724 F.3d 713 (6th Cir.2013).......................................2, 5, 12, 14-15

*In re Equifax Inc. Customer Data Sec. Breach Litig.,*
    999 F.3d 1247 (11th Cir.2021)....................................................1, 3, 7

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.,*
    62 F.4th 704 (2d Cir.2023),,,......................................................,,,1, 3, 8-9

*Flemming v. Barnwell Nursing,*
    56 App.Div.3d 162, 865 N.Y.S.2d 706 (2008),
    *aff'd* 15 N.Y.3d 375, 912 N.Y.S.2d 504,
    938 N.E.2d 937 (2010).....................................................15

*Goldberger v. Integrated Resources, Inc.,*
    209 F.3d 43 (2d Cir.2000)..............................................2

*Hadix v. Johnson,*
    322 F.3d 895 (6th Cir.2003)..............................................2, 5, 14-15

*Hyland v. Navient Corp.,*
    48 F.4th 110 (2d Cir.2022).......................................................3, 8-9

iii

*Johnson v. NPAS Solutions, LLC,*
    975 F.3d 1244 (11th Cir.2020),
    *reh'g denied,* 43 F.4th 1138 (11th Cir.2022)..................................1-6

*Lee v. Buth-Na-Bodhaige, Inc.,*
    2019 IL App (5th) 180033, 143 N.E.3d 645..............................5, 15

*Medical & Chiropractic Clinic, Inc. v. Oppenheim,*
    981 F.3d 983 (11th Cir.2020).....................................................1, 3, 7

*Melito v. Experian Mktg. Sols., Inc.,*
    923 F.3d 85 (2d Cir.2019).........................................................3, 7-9

*Muransky v. Godiva Chocolatier, Inc.,*
    922 F.3d 1175 (11th Cir.2019), *vacated on grant of*
    *rehearing en banc,* 939 F.3d 1278 (11th Cir.2019),
    *on rehearing en banc,* 979 F.3d 917 (11th Cir.2020)(en banc).........8

*Shane Group, Inc. v. Blue Cross Blue Shield,*
    825 F.3d 299 (6th Cir.2016)...............................................2, 5, 14-15

*Smith v. Swormstedt,*
    57 U.S. (16 How.) 288 (1853)....................................................10-11

*Supreme Tribe of Ben-Hur v. Cauble,*
    255 U.S. 356 (1921)........................................................................10

*Trustees v. Greenough,*
    105 U.S. 527 (1882)………………………………………....*passim*

*United States v. McIver,*
    688 F.2d 726 (11th Cir.1982)..........................................................8

## STATUTES

Class Action Fairness Act ("CAFA").......................................................4-5

28 U.S.C. §1712(a)...................................................................................4-5

28 U.S.C. §2072(b).................................................................................13-14

**Page**

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed.R.Civ.P. 23.................................................................10-14

Fed.R.Civ.P. 23(b)(3)..............................................................11

Fed.R.Civ.P. 23(e).............................................................9-10, 13

Fed.R.Civ.P. 23(e)(2)(D)......................................................9, 12-13

SECONDARY SOURCES

5 William B. Rubenstein,
    *Newberg on Class Actions* (5th ed. 2015)..................................11-13

5 William B. Rubenstein,
    *Newberg and Rubenstein on Class Actions* (6th ed. 2022).............13

# I.  RULE 35(b)(1) STATEMENT

Objector-Appellant Eric Alan Isaacson respectfully submits that en banc rehearing is warranted in this case because the Panel Opinion conflicts with the Supreme Court's foundational class-action common-fund decisions, *Trustees v. Greenough,* 105 U.S. 527, 537-38 (1882)("*Greenough*"), and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 122 (1885)("*Pettus*"). Those decisions expressly prohibit payments to representative plaintiffs to compensate them for services rendered in litigation securing a common-fund recovery. As a consequence, the Panel Opinion conflicts as well with Eleventh Circuit decisions soundly holding that "Supreme Court precedent prohibits incentive awards." *Johnson v. NPAS Solutions, LLC,* 975 F.3d 1244, 1255 (11th Cir.2020)("*Johnson v. NPAS*"), *reh'g denied,* 43 F.4th 1138 (11th Cir.2022); *accord, e.g., In re Equifax Inc. Customer Data Sec. Breach Litig.,* 999 F.3d 1247, 1257 (11th Cir.2021)("such awards are prohibited"); *Medical & Chiropractic Clinic, Inc. v. Oppenheim,* 981 F.3d 983, 994 n.4 (11th Cir.2020)("*Oppenheim*")("such service awards are foreclosed by Supreme Court precedent").

This Court has itself acknowledged: "Service awards are likely impermissible under Supreme Court precedent." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.,* 62 F.4th 704, 720-21 (2d Cir.2023). It should act now to correct this serious conflict with Supreme Court precedent, and with Eleventh Circuit law, on what amounts to an exceptionally

1

important issue affecting numerous class actions just like this one. Payments to representative plaintiffs in cases like this may all too easily induce them "to compromise the interest of the class for personal gain." *In re Dry Max Pampers Litig.,* 724 F.3d 713, 722 (6th Cir.2013)(quoting *Hadix v. Johnson,* 322 F.3d 895, 897 (6th Cir.2003)), *see Shane Group, Inc. v. Blue Cross Blue Shield,* 825 F.3d 299, 311 (6th Cir.2016).

## II. QUESTION PRESENTED

The Supreme Court's foundational common-fund class-action precedents, *Trustees v. Greenough,* 105 U.S. 527, 537-38 (1882)("*Greenough*"), and *Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 122 (1885)("*Pettus*"), together provide the basis for attorney's fee awards in common-fund cases. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980); *Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 257-58 (1975); *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 47, 52 (2d Cir.2000). They also expressly prohibit additional payments to representative plaintiffs to reward or compensate them for personal service as class representatives.

Approving an award of attorney's fees incurred by the representative plaintiff in *Greenough,* the Supreme Court held that any additional payment for the representative plaintiff's "personal service" was improper and "illegally made." 105 U.S. at 537-38. And in *Pettus* the Court reiterated that the representative plaintiff's "claim to be compensated, out of the fund or property recovered, for his personal

2

services ... was rejected as unsupported by reason or authority." *Pettus,* 113 U.S. at 122. The Eleventh Circuit thinks these decisions are clear: "Supreme Court precedent prohibits incentive awards." *Johnson v. NPAS Solutions, LLC,* 975 F.3d 1244, 1255 (11th Cir.2020)("*Johnson v. NPAS*"), *reh'g denied,* 43 F.4th 1138 (11th Cir.2022).[1] This Court too has acknowledged: "Service awards are likely impermissible under Supreme Court precedent." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.,* 62 F.4th 704, 720-21 (2d Cir.2023). Yet it continues to follow *Melito v. Experian Mktg. Sols., Inc.,* 923 F.3d 85, 96 (2d Cir.2019), in *Hyland v. Navient Corp.,* 48 F.4th 110, 123-24 (2d Cir.2022), which approved of such awards, and even in *Fikes Wholesale,* 62 F.4th at 720-21, which acknowledged that they are contrary to Supreme Court precedent.

The central question presented is: Whether *Greenough* and *Pettus* continue to bar payments in common-fund cases to compensate representative plaintiffs for their service in pursuing and settling the litigation, as the Eleventh Circuit held in *Johnson v. NPAS,* or whether they may instead be ignored by this Court.

---

[1] *Accord, e.g., In re Equifax Inc. Customer Data Sec. Breach Litig.,* 999 F.3d 1247, 1257 (11th Cir.2021)("such awards are prohibited"); *Medical & Chiropractic Clinic, Inc. v. Oppenheim,* 981 F.3d 983, 994 n.4 (11th Cir.2020)("*Oppenheim*")("such service awards are foreclosed by Supreme Court precedent").

## III.  STATEMENT OF THE CASE

This case involves the settlement of a consumer class action on behalf of California *New York Times* subscribers whose subscriptions were automatically renewed in alleged violation of California law. The settlement produced a $1.65 million cash common fund, from which Class Counsel were awarded attorney's fees of $1.25 million, or roughly 76% of the fund. The Named Plaintiff was allocated an incentive payment of $5,000, in return for her service as a representative plaintiff. The few class members who submitted claims would receive far smaller payments. The vast majority of class members, however, would only receive one month's free access to a New York Times publication other than one to which they currently subscribe—and which they could not use as a credit to pay for or extend their own existing subscriptions.

Eric Alan Isaacson, a member of the class, objected to the settlement, 76% attorney's fee award, and $5,000 incentive payment to the Named Plaintiff. Isaacson argued that an attorney's fee amounting to 76% of the cash common fund was excessive, and that the one-month subscription Access Codes amounted to "coupons" subject to the Class Action Fairness Act ("CAFA") mandate that "[i]f a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." 28 U.S.C. §1712(a).

4

Isaacson objected as well to the $5,000 payment to the Named Plaintiff, arguing that such payments produce a conflict of interest, potentially inducing representative plaintiffs "'to compromise the interest of the class for personal gain.'" APX207-08(DE48:1-2) (Isaacson objection, quoting *In re Dry Max Pampers Litig.,* 724 F.3d 713, 722 (6th Cir.2013)(quoting *Hadix v. Johnson,* 322 F.3d 895, 897 (6th Cir.2003)), and citing *Shane Group, Inc. v. Blue Cross Blue Shield,* 825 F.3d 299, 311 (6th Cir.2016)). "'Incentive payments raise questions about collusion and whether the interests of the class have been relegated to a less prominent role in the litigation.'" APX207-08(DE48:1-2) (Isaacson objection, quoting *Lee v. Buth-Na-Bodhaige, Inc.,* 2019 IL App (5th) 180033, ¶104, 143 N.E.3d 645, 675.

Citing the Eleventh Circuit's decision in *Johnson v. NPAS Solutions, LLC,* 975 F.3d 1244, 1255 (11th Cir.2020), Isaacson argued as well that "Supreme Court precedent prohibits incentive awards." APX207-08(DE48:1-2) (Isaacson objection, quoting *Johnson v.* NPAS, 975 F.3d at 1255-61). The Supreme Court's still-binding decisions in "'*Greenough* and *Pettus* prohibit the type of incentive award that the district court [involved] here—one that compensates a class representative for his time and rewards him for bringing a lawsuit.'" APX207-08(DE48:1-2) (Isaacson objection, quoting *Johnson v. NPAS,* 975 F.3d at 1255-61).

Overruling Isaacson's objections, the District Court approved the coupon settlement and $1.25 million attorney's fee award. So Isaacson appealed to this Court, which vacated settlement approval. It held the district court applied an impermissible presumption of fairness, and sustained Isaacson's objection that the Access Codes for one-month subscriptions amount to "coupons" subject to CAFA's coupon-settlement provisions. But it expressly rejected Isaacson's objection that incentive awards compensating representative plaintiffs for service in securing a common-fund settlement are barred by the Supreme Court's holdings in *Greenough* and *Pettus.*

Isaacson now respectfully seeks en banc rehearing to reconsider this last conclusion since, as the Eleventh Circuit has soundly concluded, "Supreme Court precedent prohibits incentive awards." *Johnson v. NPAS,* 975 F.3d at 1255-61.

## IV. ARGUMENT

This Court is bound by the Supreme Court's decisions concerning awards to representative plaintiffs from common-fund recoveries. "Since the decisions in *Trustees v. Greenough,* 105 U.S. 527 (1882), and *Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116 (1885)," the Supreme Court reiterated in *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980), "this Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or

his client is entitled to a reasonable attorney's fee from the fund as a whole." *Id.* Any additional payment to compensate representative plaintiffs for their own "personal services" on behalf of a class, those decisions held, is both "decidedly objectionable" and "illegally made." *Greenough,* 105 U.S. at 537-38. A representative plaintiff's "claim to be compensated, out of the fund ... for his personal services" was "rejected as unsupported by reason or authority." *Pettus,* 113 U.S. at 122.

That is why the Eleventh Circuit holds that "Supreme Court precedent prohibits incentive awards." *Johnson v. NPAS,* 975 F.3d at 1255; *accord, e.g., In re Equifax Inc. Customer Data Sec. Breach Litig.,* 999 F.3d 1247, 1257 (11th Cir.2021)("such awards are prohibited"); *Medical & Chiropractic Clinic, Inc. v. Oppenheim,* 981 F.3d 983, 994 n.4 (11th Cir.2020)("*Oppenheim*")("such service awards are foreclosed by Supreme Court precedent").

This Court has struck a different course. In *Melito v. Experian Mktg. Sols., Inc.,* 923 F.3d 85, 96 (2d Cir.2019), a three-judge panel of this Court summarily refused to honor the Supreme Court's holdings in *Greenough* and *Pettus*, relying exclusively on an Eleventh Circuit panel

opinion since vacated and repudiated by that court.[2] Subsequent Second Circuit decisions have deemed *Melito* controlling despite apparent conflict with otherwise controlling Supreme Court precedent. "We are bound by *Melito*'s holding unless or until it is overruled by the Supreme Court or the Second Circuit in banc," this Court held in *Hyland v. Navient Corp.,* 48 F.4th 110, 124 n.5 (2d Cir.2022).

"Service awards are likely impermissible under Supreme Court precedent," this Court conceded in *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.,* 62 F.4th 704, 720-21 (2d Cir.2023). But even if they appear to "undo a Supreme Court holding," this Court held in *Fikes Wholesale*, "*Melito* and *Navient* are precedents that we must follow." *Fikes Wholesale,* 62 F.4th at 721. *Melito* and *Hyland* had, the *Fikes Wholesale* panel opinion's author observed in a separate concurring opinion, placed this Court "on the wrong side of a circuit split." *Fikes Wholesale,* 62 F.4th at 729 (Jacobs, Cir.J., concurring). Yet the Court deemed intervening

---

[2] *See Melito,* 923 F.3d at 96 (following *Muransky v. Godiva Chocolatier, Inc.,* 922 F.3d 1175 (11th Cir.2019), *vacated on grant of rehearing en banc,* 939 F.3d 1278, 1279 (11th Cir.2019), *on rehearing en banc,* 979 F.3d 917, 936 (11th Cir.2020)(en banc)("neither this Court nor the district court has jurisdiction"). The original *Muransky* panel opinion, that *Melito* followed, "has no precedential value … as it was vacated pursuant to granting of rehearing en banc." *United States v. McIver,* 688 F.2d 726, 729 n.5 (11th Cir.1982). A panel opinion "vacated as a result of the grant of the petition for rehearing en banc … constitutes no precedent." *United States v. Rice,* 635 F.2d 409, 410 n.1 (5th Cir. Jan. 26, 1981).

Second Circuit case law superior to controlling decisions of the Supreme Court.

The Panel Opinion in this case aggravates the problem by again following this Court's ill-considered decisions in *Melito* and *Hyland,* this time trying to backfill with new, previously unstated, rationales for those decisions. *See* Panel Opinion, at 18-20, 40-48.

The Panel Opinion suggests that whatever their status as the Supreme Court's foundational common-fund decisions, *Greenough* and *Pettus* have been overruled *sub silentio* by a 2018 amendment to Federal Rule of Civil Procedure 23(e), which added in 23(e)(2)(D) that district courts evaluating a proposed "settlement's adequacy must consider, *inter alia,* whether "the proposal treats class members equitably relative to each other." Fed.R.Civ.P. 23(e)(2)(D). The new "Rule 23(e)(2)(D) does not forbid incentive awards," the Panel Opinion asserts, without explaining how it could possibly be construed to overrule the Supreme Court's own precedents concerning what is equitable in the context of common-fund cases. In fact, the Panel Opinion concedes that the amendment was not designed to have this effect: "The Advisory Committee Note to the 2018 Amendment suggests that incentive awards, far from being a central concern of the requirement of 'equitable[e]' treatment of class members, may not have been on the drafters' radar at all." Panel Opinion at 18.

Yet the Panel Opinion appears to insist that the amendment to Rule 23(e) accidentally overruled *Greenough* and *Pettus* nevertheless:

"Isaacson argues that we should adopt the Eleventh Circuit's approach and reverse our established precedent. We decline to depart from Rule 23's mandate, which permits fair and appropriate incentive awards." Panel Opinion at 43. Although Rule 23 on its face neither mandates incentive awards nor authorizes district courts to ignore Supreme Court precedent forbidding them, and although the 2018 revision concededly was not intended to have any such effect, the Panel Opinion nevertheless insists that it supersedes *Greenough* and *Pettus*.

The Panel Opinion nonetheless asserts that "*Greenough* and *Pettus* have been superseded, not merely by practice and usage, but by Rule 23, which creates a much broader and more muscular class action device than the common law predecessor that spawned the nineteenth-century precedents." Panel Opinion at 45. Rule 23, however, did not create the class-action device, and nothing in its text has ever authorized incentive awards to compensate litigants for service as class representatives.

"Class suits have long been recognized in federal jurisprudence," the Supreme Court observed in *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 363 (1921)(citing, e.g., *Smith v. Swormstedt,* 57 U.S. (16 How.) 288, 303 (1853)). *Greenough* and *Pettus* themselves were both class actions. Codification of the class action device in 1938 with the adoption of the Federal Rules of Civil Procedure did not overrule those decisions' common-fund holdings. Amendment of Rule 23 in 1969, creating the

10

modern Rule 23(b)(3) class action, did not overturn *Greenough* and *Pettus.* Neither did it authorize incentive awards, which lower courts started awarding in the 1980s and 1990s without any basis at all in statute or rule.

The Fifth Edition of *Newberg on Class Actions,* edited by Professor William B. Rubenstein, explained in 2015 that lower courts acted without authority:

> Rule 23 does not currently make, and has never made, any reference to incentive awards, service awards, or case contribution awards. The judiciary has created these awards out of whole cloth, yet both judges—and Congress— have expressed concerns about them. The concerns center on the fact that incentive awards have the potential to interfere with a class representative's ability to perform her job adequately. That job is to safeguard the interests of the absent class members. But with the promise of a significant award upon settlement of a class suit, the representative might prioritize securing that payment over serving the class. Thus, incentive awards threaten to generate a conflict between the representative's own interests and those of the class she purports to represent.

5 William B. Rubenstein, *Newberg on Class Actions* §17:1 at 492 (5th ed. 2015); *see also id.* §17:2 at 494.

Under the heading "**§17:4 Legal basis for incentive awards,**" Professor Rubenstein wrote:

It might be most apt to leave this section of the Treatise blank as Rule 23 does not currently make, and has never made, any reference to incentive awards, service awards, or case contribution awards. The judiciary has created these awards out of whole cloth. In doing so, courts have explained the[ir] rationale for incentive awards, as discussed in the preceding section; but few courts have paused to consider the legal authority for incentive awards. The Sixth Circuit's observation that "to the extent that incentive awards are common, they are like dandelions on an unmowed lawn— present more by inattention than by design" therefore accurately describes the judiciary's attention to the legal basis for making incentive awards.

5 William B. Rubenstein, *Newberg on Class Actions* §17:4 at 510-11 (5th ed. 2015)(footnotes omitted; quoting *In re Dry Max Pampers Litig.,* 724 F.3d 713, 722 (6th Cir.2013)).

"Given that incentive awards are relatively common in class action practice," Professor Rubenstein added in *Newberg*'s Fifth Edition, "their legal basis is surprisingly thin." 5 William B. Rubenstein, *Newberg on Class Actions* §17:4 at 516 (5th ed. 2015). Of course, Professor Newberg does an about-face in *Newberg*'s Sixth Edition, asserting that the 2018 amendment adding Rule 23(e)(2)(D) somehow supersedes *Greenough* and provides a textual mooring for incentive awards. *Compare* 5 William B. Rubenstein, *Newberg on Class Actions,* Chapter 17, at 491-589 (5th ed. 2015)(repeatedly disparaging incentive awards as unauthorized judicial

fabrications made "of whole cloth"), *with* 5 William B. Rubenstein, *Newberg and Rubenstein on Class Actions,* Chapter 17, at 583-692 (6th ed. 2022)(entire chapter rewritten to defend the propriety of incentive awards after the 2018 revision to Rule 23(e)).

The trouble is, of course, that incentive awards' rise in the 1990s was entirely unconnected with anything in Rule 23, and the decades-later, long after-the-fact 2018 revision to Rule 23(e) was not really designed to permit them. The Panel Opinion itself concedes that the issue "may not have been on the drafters' radar at all." Panel Opinion at 19. Even if it had been, amendment of the rules could not create any new right to payment in common-fund cases, for Congress has specified in the Rules Enabling Act that the promulgation of federal "rules shall not abridge, enlarge or modify any substantive right." 28 U.S.C. §2072(b). "Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'" *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 613 (1997)(quoting 28 U.S.C. § 2072(b)).

Thus, no amendment of Rule 23 could authorize the payment of incentive awards to representative plaintiffs. None has. The Panel Opinion fails to justify its departure from the rule of *Greenough* and *Pettus*.

The deviation is one that has serious deleterious effects, for the prospect of incentive awards can be employed by class counsel to recruit representative plaintiffs who have no real interest in pursuing litigation. Even worse, they can be used to induce representative plaintiffs to settle on terms that benefit themselves rather than the class. The expectation of an incentive award seriously undermines a class representative's incentive to be loyal to the class and to place its interests above her own.

The Sixth Circuit has oft "expressed a 'sensibl[e] fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain." *In re Dry Max Pampers Litig.,* 724 F.3d 713, 722 (6th Cir.2013)(quoting *Hadix v. Johnson,* 322 F.3d 895, 897 (6th Cir.2003)); *accord Shane Group, Inc. v. Blue Cross Blue Shield,* 825 F.3d 299, 311 (6th Cir.2016). Such awards may create, "in fact 'a ***disincentive*** for the [named] class members to care about the adequacy of relief afforded unnamed class members[.]'"

*Shane Group,* 825 F.3d at 311 (quoting *Dry Max,* 724 F.3d at 722 (quoting *Hadix,* 322 F.3d at 897))(*Shane Group*'s brackets; emphasis in original)).

Even state courts recognize the danger: "Incentive payments raise questions about collusion and whether the interests of the class have been relegated to a less prominent role in the litigation." *Lee v. Buth-Na-Bodhaige, Inc.,* 2019 IL App (5th) 180033, ¶104, 143 N.E.3d 645, 675. Indeed:

> Class representatives may be tempted to accept suboptimal settlements at the expense of the remaining class members in exchange for special awards in addition to their share of the recovery, thus undermining their effectiveness as fiduciaries of the class .... Some individuals may commence spurious class actions with the expectation of settlements leading to compensation in the form of incentive awards.

*Flemming v. Barnwell Nursing,* 56 App.Div.3d 162, 166, 865 N.Y.S.2d 706, 709 (2008), *aff'd* 15 N.Y.3d 375, 912 N.Y.S.2d 504, 938 N.E.2d 937 (2010)(citation omitted).

The issue thus is an exceptionally important one, affecting the majority of class-action settlements and, indeed, the very integrity of class-action litigation in the United States.

## V.   CONCLUSION

The Court should reconsider en banc whether the Supreme Court's decisions in *Greenough* and *Pettus* permit representative plaintiffs to be

compensated for their personal service in securing a common fund settlement.

DATED: August 31, 2023     Respectfully submitted,

<div style="text-align: right">

/s/ Eric Alan Isaacson
Eric Alan Isaacson
*Objector-Appellant*

Law Office of Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037
Telephone: (858) 263-9581
Email: ericalanisaacson@icloud.com

</div>

## CERTIFICATE OF COMPLIANCE

The foregoing petition complies with the type-volume limitation in FRAP 35(b)(2)(A) and 40(b)(1), because it contains 3,302 words as counted by the Microsoft Word (version 16.76(23082301)) word-processing system used to prepare the brief, exclusive of the parts of the brief exempted from the type-volume limitation by Federal Rule of Appellate Procedure 32(f). The petition was prepared in a 14-point Century Schoolbook font.

Dated: August 31, 2023

          <u>    /s/ Eric Alan Isaacson    </u>
          ERIC ALAN ISAACSON

# EXHIBIT A

1   **UNITED STATES COURT OF APPEALS**
2   **FOR THE SECOND CIRCUIT**
3   ————————————
4
5   August Term, 2022
6
7   Argued: March 22, 2023    Decided: August 17, 2023
8
9   Docket No. 21-2556-cv
10  ————————————
11
12  MARIBEL MOSES, on behalf of herself and all others similarly situated,
13
14  *Plaintiff-Appellee,*
15
16  — v. —
17
18  THE NEW YORK TIMES COMPANY, d/b/a The New York Times
19
20  *Defendant-Appellee,*
21
22  — v. —
23
24  ERIC ALAN ISAACSON,
25
26  *Objector-Appellant.*
27
28  ————————————
29
30  Before:
31
32  PARKER, LYNCH, and LOHIER, *Circuit Judges.*

Objector-Appellant Eric Alan Isaacson appeals from a judgment of the United States District Court for the Southern District of New York (Abrams, *J.*) approving a settlement award, attorneys' fee award, and incentive award in a class action brought by Plaintiff-Appellee Maribel Moses against Defendant-Appellee The New York Times ("NYT"). Plaintiff's complaint alleges that NYT violated California's Automatic Renewal Law, Cal. Bus. & Prof. Code § 17600 *et seq.*, by automatically renewing subscriptions without providing the disclosures and authorizations required by that law. Following mediation, the district court (1) approved a settlement that provides class members with Access Codes valid for a free one-month subscription to a NYT product, (2) awarded attorneys' fees in the amount of $1.25 million (76% of the settlement's cash fund), and (3) awarded a $5,000 incentive payment to Moses. Isaacson appeals all three determinations, arguing that the district court applied the wrong legal standard in its Rule 23 analysis of the settlement's fairness; incorrectly concluded that Access Codes are not coupons subject to the Class Action Fairness Act, 28 U.S.C. § 1712; and contravened Supreme Court precedent by awarding an incentive payment. We agree with the first two contentions, but reject the third. We therefore **VACATE** the district court's judgment and **REMAND** for further proceedings.

FREDERICK J. KLORCZYK III (Neal J. Deckant, *on the brief*), Bursor & Fisher, P.A., New York, NY & Walnut Creek, CA, *for Plaintiff-Appellee.*

KRISTEN C. RODRIGUEZ (Natalie J. Spears, Sandra D. Hauser, *on the brief*), Dentons US LLP, Chicago, IL & New York, NY, *for Defendant-Appellee.*

ERIC ALAN ISAACSON, Law Office of Eric Alan Isaacson, La Jolla, CA, *for Objector-Appellant.*

GERARD E. LYNCH, *Circuit Judge*:

Objector-Appellant Eric Alan Isaacson, proceeding *pro se*, appeals from a judgment of the United States District Court for the Southern District of New York (Ronnie Abrams, *J.*) approving a settlement award, attorneys' fee award, and incentive award in a class action lawsuit. Plaintiff-Appellee Maribel Moses, on behalf of similarly situated subscribers in California, sued Defendant-Appellee The New York Times ("NYT"), claiming that NYT automatically renewed NYT subscriptions without providing the disclosures and authorizations required by California's Automatic Renewal Law, Cal. Bus. & Prof. Code § 17600, *et seq.* (the "ARL").

The parties negotiated a settlement agreement whereby class members dropped their claims in exchange for NYT's reformation of its business practices and either Access Codes for one-month NYT subscriptions or *pro rata* cash payments. The settlement agreement also provided for the payment of substantial attorneys' fees to class counsel and an incentive award to the class representative. Isaacson objected to the proposed settlement, primarily arguing that the

settlement is unfair, the attorneys' fees calculation improperly exceeds limits set by the coupon settlement provisions of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1712, and the incentive award is not authorized by law. The district court disagreed, certifying a class for settlement purposes under Rule 23(b)(2) of the Federal Rules of Civil Procedure and approving the settlement, $1.25 million attorneys' fees, and a $5,000 incentive award.

On appeal, we agree with Isaacson that the district court exceeded its discretion when it approved the settlement based on the wrong legal standard in contravention of Rule 23(e). We also agree that the Access Codes are coupons, which subject the attorneys' fees calculation to CAFA's coupon settlement requirements. However, we reiterate our holding in *Melito v. Experian Marketing Solutions, Inc.*, 923 F.3d 85, 96 (2d Cir. 2019), that incentive awards are not *per se* unlawful. Because the district court's conclusions are intertwined, we **VACATE** the district court's judgment in its entirety and **REMAND** the case to the district court for further proceedings consistent with this opinion.

## BACKGROUND

### I.     Factual Background

On June 17, 2020, Moses brought a putative class action in the Southern

4

District of New York on behalf of a class of California NYT subscribers whose

subscriptions, she alleged, were automatically renewed in violation of the ARL.

The subsequently filed amended complaint alleged that when consumers sign up

for an NYT subscription through NYT's Website or App, NYT enrolls them in an

automatically renewing subscription without providing the disclosures and

authorizations required by the ARL.

NYT moved to dismiss the amended complaint under Rule 12(b)(6) of the

Federal Rules of Civil Procedure for failure to state a claim. Before the district

court ruled on the motion, however, the parties engaged in informal discovery

and mediation. After a nine-hour mediation with the assistance of a professional

mediator, the parties executed a binding Settlement Term Sheet.

## II.    The Settlement Agreement

A formal Settlement Agreement was signed on March 30, 2021, settling the

claims of more than 876,000 persons who – from June 17, 2016, through May 12,

2021 – directly enrolled in an automatically renewing NYT subscription using a

California billing and/or delivery address, and who were charged and made to

pay an automatic renewal fee (the "class" or "class members").

Under the terms of the Settlement Agreement, NYT agreed to implement

business reforms to comply with the ARL, including revising the presentation of its automatic renewal terms and providing consumers who enroll in an automatically renewing subscription with an acknowledgment. Class members agreed to release their claims against NYT in exchange for those business reforms and either (1) a *pro rata* cash payment from a non-reversionary Settlement Fund of $1.65 million or (2) Access Codes for one-month NYT subscriptions to certain NYT publications.

The Settlement Fund was established to pay all approved claims by class members, notice and administration expenses, a court-approved incentive award to Moses of up to $5,000, and attorneys' fees of up to $1.25 million. Although class members were directed to submit a cash election form in order to receive cash payment, no claim form was necessary for class members to obtain an Access Code.[1] The Access Codes provide class members – or persons to whom they transfer the Access Codes – with a free one-month subscription to a NYT product valued between $3 to $5, and are valid for at least 50 years. However, they cannot be used to pay for or extend an existing subscription. In other words, a class

---

[1] Under the settlement, the Settlement Administrator will email the Access Codes to the remaining 800,000+ class members who took no action.

1    member must start a new subscription in order to apply the Access Codes.

2         The type of NYT subscription a class member is eligible to receive depends

3    on whether his or her subscription was Fully Active, Active, or Inactive as of May

4    12, 2021. Fully Active class members – those class members "who are currently

5    active subscribers entitled to access to all of NYT's digital [s]ubscription

6    offerings," App'x 119 – are entitled to a NYT Basic Digital Access subscription

7    (NYT's core news subscription). Active class members – those class members

8    with at least one active NYT subscription – are entitled to a subscription to either

9    of two NYT Digital Products (NYT Cooking and NYT Games) to which the class

10   member does not currently subscribe. Inactive class members – those class

11   members "who do not currently have any active NYT [s]ubscription," *id.* – are

12   entitled to a NYT Basic Digital Access subscription.

13        **III.    The Settlement Approval**

14        On May 12, 2021, the district court conditionally certified the class for

15   purposes of the settlement and preliminarily approved the Settlement Agreement.

16   Notice was subsequently disseminated in compliance with the district court's

17   preliminary approval order. About 95.2% of 876,606 class members received

18   direct notice of the settlement; 10,541 class members submitted valid and timely

claims to receive *pro rata* cash payments rather than Access Codes; 18 class

members requested to be excluded from the settlement class; and three class

members,[2] including Isaacson, objected to the settlement.

On September 10, 2021, the district court conducted a fairness hearing,

where it heard Isaacson's arguments regarding the consideration offered to class

members, attorneys' fees, and incentive award. The district court rejected

Isaacson's objections and approved the settlement. First, the district court applied

a presumption of fairness to the settlement because "it was reached in

arm's-length negotiation between experienced, capable counsel . . . after a

nine-hour mediation before a mutual third party." App'x 258. Based on a review

of the settlement's substantive terms, the district court concluded that the

settlement demonstrated sufficient fairness, adequacy, and reasonableness as

supported by the factors outlined in Rule 23(e)(2) and *City of Detroit v. Grinnell

Corp.*, 495 F.2d 448, 462-63 (2d Cir. 1974).

Then, the district court addressed Isaacson's objections. As to the adequacy

---

[2] Two class members sent letters summarily objecting to the lawsuit on
"frivol[ity]" grounds, asserting that the "suit . . . is not fair [or] reasonable" and is
"utterly silly." App'x 448-49. Only Isaacson raised detailed objections and filed a
notice to appear at the final approval hearing.

1   of consideration to class members, the district court noted that the relief afforded

2   to the class was "commensurate with the harm alleged" as evidenced by the

3   "reaction of the class" and "risks associated with litigating this action." App'x

4   259. With regard to Isaacson's argument about the impropriety of a $5,000

5   incentive award to Moses, the district court explained that such awards are

6   permitted under Second Circuit precedent and that the award did not preclude

7   Moses from adequately representing the class.

8       Finally, the district court addressed concerns about the value of the

9   settlement relief and its impact on the proposed attorneys' fee award. The district

10  court concluded that the case was not subject to CAFA's coupon settlement

11  provisions and "judge[d] the propriety of the fee award as compared to the value

12  of the entire settlement, including the [A]ccess [C]odes," which had a face value

13  of $3.9 million. App'x 261. As a result, the district court found that an attorneys'

14  fee award of $1.25 million – 22.5% of the total face value of the settlement

15  ($5,563,000) – was reasonable under the factors outlined in *Goldberger v. Integrated*

16  *Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000), even when cross-checked against the

17  lodestar amount.

18      Accordingly, on September 13, 2021, the district court certified the

settlement class and approved the settlement, awarding $1.25 million in

attorneys' fees (about 76% of the $1.65 million cash Settlement Fund, and 22.5% of

the total value of the settlement including the face value of the Access Codes) and

an incentive payment of $5,000 to Moses. The district court noted that the fee

awards were "considered . . . separately from the [c]ourt's consideration of the

fairness, reasonableness and adequacy of the settlement." Special App'x 6.

This appeal followed.

## DISCUSSION

Isaacson argues that the district court erred in three primary aspects of its

ruling: (1) misapplying Rule 23(e)'s legal standard in its review of the proposed

settlement, (2) awarding $1.25 million in attorneys' fees based on a conclusion

that the Access Codes are not "coupons" under CAFA, and (3) awarding Moses

an incentive award of $5,000 and concluding that she provided adequate

representation. We address each argument in turn.

### I.    Standard of Review

We review a district court's approval of a settlement agreement, including

attorneys' fees and incentive awards, for abuse of discretion. *See Fikes Wholesale,*

*Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 723 (2d Cir. 2023); *Hyland v. Navient*

*Corp.*, 48 F.4th 110, 117 (2d Cir. 2022). "A district court abuses – or more precisely,

exceeds – its discretion when its decision rests on an 'error of law' or a 'clearly

erroneous factual finding,' or 'cannot be located within the range of permissible

decisions.'" *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 666 (2d Cir. 2023), quoting

*Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

We review questions of statutory interpretation, like the scope of CAFA's

coupon settlement provisions, *de novo. See United States v. Bedi*, 15 F.4th 222,

225-26 (2d Cir. 2021). "We [also] review *de novo* any issues of law underlying the

Rule 23 ruling, including the question of whether the district court applied the

correct [legal standard to the approval of the settlement]." *Teamsters Loc. 445*

*Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008).

**II.     Rule 23(e)**

Isaacson argues that the district court applied the wrong legal standard

when it approved the proposed settlement, attorneys' fee award, and incentive

award.

A district court may approve a settlement proposal that binds class

members only "after a hearing and on finding that it is fair, reasonable, and

11

adequate." Fed. R. Civ. P. 23(e)(2). To evaluate the fairness, reasonableness, and adequacy of a class settlement, we have historically applied the nine factors set out in *Grinnell Corp.*, 495 F.2d at 463.[3]

In 2018, however, Congress approved a revision of Rule 23 to include a list of four "primary procedural considerations and substantive qualities that should always matter to the decision whether to approve [a settlement] proposal." Fed. R. Civ. P. 23(e)(2) Advisory Committee's Note to 2018 Amendment. The revision was "not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance," *id.,* including whether:

> (A) the class representatives and class counsel have
> adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking
> into account:
> (i) the costs, risks, and delay of trial and appeal;

---

[3] These factors include: "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Hyland*, 48 F.4th at 124, quoting *Grinnell Corp.*, 495 F.2d at 463.

<div style="margin-left: 3em">

(ii) the effectiveness of any proposed method of
distributing relief to the class, including the
method of processing class-member claims;
(iii) the terms of any proposed award of attorney's
fees, including timing of payment; and
(iv) any agreement required to be identified under
Rule 23(e)(3); and
(D) the proposal treats class members equitably relative
to each other.

</div>

Fed. R. Civ. P. 23(e)(2). The first two factors are procedural in nature and the

latter two guide the substantive review of a proposed settlement. *See* Fed. R. Civ.

P. 23(e)(2) Advisory Committee's Note to 2018 Amendment.

For the reasons discussed below, we hold that Rule 23(e)(2)'s procedural

factors prohibit courts from applying a presumption of fairness to proposed

settlements arising from an arms-length agreement. Courts evaluating the

fairness, reasonableness, and adequacy of a proposed settlement must consider

the four factors outlined in Rule 23(e)(2) holistically, taking into account – among

other substantive considerations stated in the rule – the proposed attorneys' fees

and incentive awards. As discussed below, the revised Rule 23(e)(2) does not

displace our traditional *Grinnell* factors, which remain a useful framework for

considering the substantive fairness of a settlement. But the rule now mandates

courts to evaluate factors that may not have been highlighted in our prior case

law, and its terms prevail over any prior analysis that are inconsistent with its requirements.

## A. Procedural Fairness

Isaacson argues that the district court erred "when it imposed a presumption of fairness, adequacy, and reasonableness to the parties' proposed class-action settlement on the ground that it was negotiated between the settling parties at arm's length." Appellant Br. 25. We agree.

Prior to Rule 23(e)(2)'s codification of the core factors that should guide a court's approval of a proposed settlement, we applied a presumption of fairness to settlement agreements resulting from arms length negotiations. *See McReynolds v. Richards-Cantave*, 588 F.3d 790, 803 (2d Cir. 2009); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); 4 Herbert B. Newberg & William B. Rubenstein, Newberg and Rubenstein on Class Actions § 13:50 (6th ed. 2022) (citing cases). The codification of arm's-length negotiation as one of two procedural factors (the other being the adequacy of class representatives and counsel) – and one of four core factors – that courts must consider when approving a proposed settlement supplants its historic role as a presumption. As the Ninth Circuit observed, applying a "presumption of fairness [to settlement

proposals negotiated at arm's length] . . . is very likely inappropriate under the standards now codified in Rule 23(e)(2)" because the rule "does not suggest that an affirmative answer to that one [factor] creates a favorable presumption on review of the other three." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 n.12 (9th Cir. 2019). We agree, and conclude that Rule 23(e)(2) prohibits courts from applying a presumption of fairness to a settlement agreement based on its negotiation at arm's length.

Thus, notwithstanding the district court's careful consideration of the settlement's procedural fairness – concluding that Moses adequately represented the class and that the Settlement Agreement was reached in an arm's-length negotiation involving a neutral mediator, *see* Fed. R. Civ. P. 23(e)(2)(A)-(B) – and notwithstanding that the arms-length quality of the negotiations remain a factor in favor of approving the settlement (one whose absence would count significantly against approval), the district court erred when it *presumed* that the proposed settlement was fair, reasonable, and adequate because it was reached in an arm's-length negotiation.

B.    *Substantive Fairness*

Isaacson argues that the district court erred by failing to evaluate the

settlement's fairness, reasonableness, and adequacy in light of the attorneys' fee award and incentive award. We agree.

Historically, we "evaluate substantive fairness [by] considering the nine *Grinnell* factors." *Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013). Although the factors outlined in *Grinnell* and the revised Rule 23(e)(2) largely overlap,[4] the rule now requires courts to expressly consider two core factors when reviewing the substantive fairness of a settlement: the adequacy of relief provided to a class and the equitable treatment of class members. *See* Fed. R. Civ. P. 23(e)(2)(C)-(D).

As to the adequacy of class relief, courts must "tak[e] into account," among

---

[4] *Compare Grinnell Corp.*, 495 F.2d at 463 (directing courts to consider "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation"), *with* Fed. R. Civ. P. 23(e)(2)(C) (directing courts to approve a settlement after "taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other").

other considerations, "the terms of any proposed award of attorney's fees." Fed.

R. Civ. P. 23(e)(2)(C)(iii). "This review provides a backstop that prevents

unscrupulous counsel from quickly settling a class's claims to cut a check." *Fresno*

*County Employees' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*, 925 F.3d 63, 72 (2d Cir.

2019); *see also Briseño v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021) (noting that

"the plain language [of the revised Rule 23(e)(2)] indicates that a court must

examine whether the attorneys' fees arrangement shortchanges the class").

Similarly, "the relief actually delivered to the class can be a significant factor in

determining the appropriate fee award." Fed. R. Civ. P. 23(e)(3) Advisory

Committee's Note to 2018 Amendment. The symbiotic review of proposed relief

and attorneys' fees aligns with "[t]he express goal of [our] *Grinnell* opinions

[which] was to prevent unwarranted windfalls for attorneys." *Goldberger*, 209

F.3d at 49.

Thus, when reviewing the substantive fairness of a proposed settlement,

"the district court is required to review both the terms of the settlement and any

fee award encompassed in a settlement agreement" in tandem. *Fresno County*

*Employees' Ret. Ass'n*, 925 F.3d at 72; *see also McKinney-Drobnis v. Oreshack*, 16

F.4th 594, 607 (9th Cir. 2021) ("[T]he new Rule 23(e) makes clear that courts must

balance the proposed award of attorney's fees vis-à-vis the relief provided for the class in determining whether the settlement is adequate for class members." (internal quotation marks omitted)).

Similar considerations apply to a proposed incentive award. Prior to approving a settlement, the court must take into account whether the "proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). The express consideration of such equity will, among other things, ensure that such incentive payments will not result in unfair settlements. *See Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 353 (1st Cir. 2022) (explaining that "Rule 23(e) ensures that incentive payments will not result in unfair settlements by requiring that any settlement . . . tak[e] into account whether 'the class representatives . . . have adequately represented the class' and whether 'the proposal treats class members equitably relative to each other'").

As discussed more fully below, Rule 23(e)(2)(D) does not forbid incentive awards. *See infra* Section IV (discussing the legality of incentive awards). The Advisory Committee Note to the 2018 Amendment suggests that incentive awards, far from being a central concern of the requirement of "equitabl[e]" treatment of class members, may not have been on the drafters' radar at all. The

18

drafters singled out, as "[m]atters of concern . . . [in the equitable evaluation,] whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23(e)(2) Advisory Committee's Note to 2018 Amendment. Such matters of concern – where inequity arises from treating different class members the same – are substantively momentous compared to the generally modest incentive payments awarded to class representatives. It bears emphasis that Rule 23(e)(2)(D) requires that class members be treated *equitably*, not identically.

Nevertheless, the existence and extent of incentive payments is relevant to whether "class members [are treated] equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). On the one hand, the equitable-treatment requirement protects the interests of class representatives who play an active role in the litigation – often providing the background information that forms the basis of the lawsuit, engaging in fact discovery, and devoting considerable time and effort into the settlement process – "from having absent class members free ride on their efforts." 5 Newberg and Rubenstein on Class Actions §§ 17:3-4 (explaining that

"if the class representatives face particular risks in serving the class and/or

undertake valuable work on behalf of the class but cannot recover any of the costs

of those efforts through an incentive fee award, they have a fair argument that the

settlement is not treating them equitably relative to the absent class members"

(emphasis omitted)); *see also Murray*, 55 F.4th at 353 ("[I]ncentive payments

remove an impediment to bringing meritorious class actions and fit snugly into

the requirement of Rule 23(e)(2)(D) that the settlement 'treats class members

equitably relative to each other.'" (quoting Fed. R. Civ. P. 23(e)(2)(D))).

At the same time, the rule requires that courts reject incentive awards that

are excessive compared to the service provided by the class representative or that

are unfair to the absent class members. *See* 5 Newberg and Rubenstein on Class

Actions § 17:4 ("The equitable treatment requirement most obviously protects

absent class members from being subjected to excessive incentive awards[.]"); *see*

*also Cline v. Touchtunes Music Corp.*, 765 F. App'x 488, 493 (2d Cir. 2019) (summary

order) (affirming denial of incentive award in light of the lawsuit's value); *Ayers*

*v. SGS Control Services, Inc.*, 2008 WL 4185813, at *6 (S.D.N.Y. 2008) (denying

incentive awards where the time and effort spent by the class representatives did

not justify the $20,000 incentive awards requested), *aff'd in part and remanded on*

*other grounds*, 353 F. App'x 466, 467 (2d Cir. 2009) (summary order). Thus, courts evaluating the substantive fairness of a settlement must ensure that proposed incentive awards are reasonable and promote equity between class representatives and absent class members.

Here, following a common practice in pre-2018 cases evaluating class action settlements for fairness, *see, e.g.*, *Stefaniak v. HSBC Bank USA*, No. 05-CV-720S, 2008 WL 314417, at *3 (W.D.N.Y. Feb. 4, 2008), *In re Worldcom, Inc. Securities Litigation*, No. 02-CV-3288, 2005 WL 78807, at *7 (S.D.N.Y. Jan. 11, 2005), the district court expressly did the opposite of what Rule 23(e)(2) now requires, reviewing the appropriateness of the attorneys' fee and incentive awards "separately from [its] consideration of the fairness, reasonableness and adequacy of the [s]ettlement," Special App'x 6. Although the district court "reviewed the settlement's substantive terms and conclud[ed] that they demonstrate[d] sufficient fairness, adequacy and reasonableness. . . . [as] supported by the factors outlined in [*Grinnell*], and in Rule 23(e)(2)," App'x 258-59, "address[ed] those factors that relate to the objections raised to the settlement," *id.* at 259, and then approved the attorneys' fees and incentive award, the court erred when it evaluated the proposed fees "*separately*" from the settlement's fairness, *id.* at 202

1    (emphasis added).

2

3        In sum, the district court abused its discretion when it evaluated and

4    approved the settlement based on the wrong legal standard. *See Metzler Inv.*

5    *Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 142 (2d Cir. 2020). Of course, the

6    error does not automatically require the reversal of the settlement's approval.

7    Given the substantial overlap between the traditional *Grinnell* factors and the

8    Rule 23(e)(2) factors, it is possible that the court's errors – in according a

9    presumption of fairness based on the settlement's arm's-length negotiation, and

10   not considering the attorneys' and incentive awards in evaluating the fairness of

11   the settlement – could be harmless. In an appropriate case, we might be able to

12   conclude that a settlement was so obviously fair or the attorneys' fees so plainly

13   reasonable that the judge would have reached the same conclusion about the

14   overall fairness of the settlement if the judge had not applied a presumption or

15   had included the evaluation of the fees as part of the fairness inquiry rather than

16   as a separate issue.

17       But as we will see, that is not the case here. In this case, the error cannot be

18   written off as harmless. The fee awards – especially the $1.25 million in attorneys'

22

1    fees (about 76% of the $1.65 million Settlement Fund) – are intimately intertwined

2    with the settlement. Indeed, there is effectively an inverse correlation between the

3    amount of attorneys' fees and incentive payment awarded and the cash available

4    for *pro rata* distribution to class members that opt for cash. *See* App'x 472 ("The

5    Settlement Fund shall be used for payment of the . . . cash benefits submitted by

6    Settlement Class Members[,] . . . the Fee Award . . . [,] [and] any Incentive Award

7    . . . ."). The district court was obligated to take these intertwined fees into account

8    prior to approving the settlement, and erred when it treated the appropriateness

9    of the awards as a separate matter, divorced from the overall evaluation of the

10   fairness of the settlement. As discussed below, moreover, the failure to recognize

11   that the attorneys' fee award violated CAFA's coupon settlement requirements

12   and that the Access Codes were in fact coupons illustrates the importance of

13   considering the fee award structure in assessing the overall fairness of the

14   settlement.

15       **III.     Coupon Settlements**

16       Isaacson argues that the district court erred in failing to apply CAFA's

17   coupon settlement provisions when calculating the attorneys' fee award because

18   the Access Codes are coupons. We agree and conclude that if those provisions are

23

1    fairly applied, the revised calculation of the fee award undermines any argument

2    that the failure to consider the Rule 23(e)(2) factors in the evaluation of the

3    settlement was harmless error.

4         In 2005, Congress enacted CAFA to address concerns surrounding class

5    actions, including the problem of excessive attorneys' fee awards in "coupon

6    settlements." S. Rep. No. 109-14, at 14-15 (2005). The concern with the attorneys'

7    fee awards in coupon settlements – those "in which class members receive

8    nothing more than promotional coupons to purchase more products from the

9    defendants," *id.* at 15 – was that they provide attorneys with a perverse incentive

10   to pursue class settlements, which provide class members with low-benefit

11   coupons but fatten the pockets of class attorneys who "reap the lion's share of the

12   [settlement] benefits" by inflating their attorneys' fees based on the exaggerated

13   and unrealistic face value of nonmonetary relief. *In re: Lumber Liquidators*

14   *Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d

15   471, 488 (4th Cir. 2020) (alteration in original). Although Congress "d[id] not

16   intend to forbid all non-cash settlements" – "[s]uch settlements may be

17   appropriate where they provide real benefits to consumer class members . . . or

18   where the claims being resolved appear to be of marginal merit"– there are raised

brows when "the real winners in the settlement are the lawyers who sued the company, who will be paid in cash, not coupons." S. Rep. No. 109-14, at 30-32 (internal quotation marks omitted).

To curb class action abuse in coupon settlements, CAFA directs courts to calculate attorneys' fee awards in such settlements based on the redemption value of the coupons, rather than their face value. *See* 28 U.S.C. § 1712(a); *McKinney-Drobnis*, 16 F.4th at 602 (noting that CAFA "ensures that class counsel benefit[s] only from coupons that provide actual relief to the class" (internal quotation marks omitted)); *Linneman v. Vita-Mix Corp.*, 970 F.3d 621, 634 (6th Cir. 2020) (noting that the "face value of a coupon may be quite different from its actual value to class members"). Here, the district court declined to do so because it concluded that the Access Codes were not coupons.

To determine whether Congress's concerns in enacting CAFA extended to settlements such as the instant one, we turn to the statutory text, first reviewing the plain meaning of the word "coupon," and then determining whether the Access Codes fall within the scope of that word.

   *A.*  *The Definition of Coupons*

Despite Congress's policy goals regarding class action settlement awards

involving coupon relief, CAFA does not define "coupon." Hence, "we look to the word's plain meaning," *i.e.*, "the ordinary, common-sense meaning of the word[]." *23–34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 182 (2d Cir. 2012), quoting *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000).

A coupon is generally defined as an item that entitles its user to free or discounted products or services. *See Coupon*, New Oxford American Dictionary 389 (2d ed. 2005) (defining a coupon as "a voucher entitling the holder to a discount for a particular product"); *Coupon*, Merriam-Webster's Third New International Dictionary 266 (2002) (defining coupon as a "form surrendered in order to obtain an article, service, or accommodation").[5] Although a coupon is often described as a physical piece of paper, there is no dispute that coupons may be (and in today's economy often are) held in digital form.

---

[5] Although many consumers are familiar with the term "coupon" as "cents off" benefits, which may be applied to purchase groceries at a discounted price, contemporary dictionaries expressly note that a coupon may be used to obtain a free product. *See, e.g.*, *Coupon*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/coupon (last visited July 31, 2023) (defining a coupon as "a small piece of paper that allows one to get a service or product for free or at a lower price"); Coupon, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/coupon (last visited July 31, 2023) (defining a coupon as "a piece of paper that you can use to buy a product or service at a reduced price or to get it free, or to get information").

1    "To the extent there is any ambiguity in the word[] [coupon, as used in] the

2    . . . statute, the legislative history eliminates any doubt." *Federal Housing Finance*

3    *Agency v. UBS Americas Inc.*, 712 F.3d 136, 142 (2d Cir. 2013). Legislative history

4    makes clear that CAFA's coupon settlement provisions apply to settlements

5    where the non-cash relief provided to class members entitles them to free or

6    discounted products or services. For example, in illustrating coupon settlements

7    where "class members receive nothing more than promotional coupons to

8    purchase more products from the defendants," Congress cited a settlement that

9    offered relief in the form of "discounts or free water" to Poland Spring customers.

10   S. Rep. No. 109-14, at 16-17; *cf. id* at 31-32 (noting that a coupon settlement may be

11   appropriate where the proposed relief "entitle[s] class members to receive

12   something of actual value free of charge"). That the non-cash relief provided to

13   class members is not labeled a coupon is not determinative. *See id.* at 18-19

14   (criticizing settlement relief labeled a "voucher").

15       Courts interpreting the plain meaning of "coupon" and reviewing CAFA's

16   legislative history have outlined additional considerations to guide the inquiry of

17   whether non-cash relief constitutes a coupon. The Ninth Circuit looks at three

18   non-dispositive factors: "(1) whether class members have 'to hand over more of

their own money before they can take advantage of' a credit, (2) whether the

credit is valid only 'for select products or services,' and (3) how much flexibility

the credit provides, including whether it expires or is freely transferrable." *In re*

*Easysaver Rewards Litig.*, 906 F.3d 747, 755 (9th Cir. 2018), quoting *In re Online*

*DVD-Rental Antitrust Litig.*, 779 F.3d 934, 951 (9th Cir. 2015). "Other courts have

considered similar criteria in evaluating whether a settlement provides for

coupon relief." *Does 1-2 v. DéJà Vu Servs., Inc.*, 925 F.3d 886, 902 (6th Cir. 2019)

(citing cases) (reviewing settlement relief in light of the Ninth Circuit's criteria);

*see also In re: Lumber Liquidators*, 952 F.3d at 491; *In re Sw. Airlines Voucher Litig.*,

799 F.3d 701, 706 (7th Cir. 2015). In addition to evaluating similar factors, the

Seventh Circuit has "rejected . . . , for purposes of § 1712, a proposed distinction

between 'vouchers' (good for an entire product) and 'coupons' (good for price

discounts)." *In re Sw. Airlines Voucher Litig.*, 799 F.3d at 706 (concluding that

"vouchers for free drinks on Southwest flights" are coupons), quoting *Redman v.*

*RadioShack Corp.*, 768 F.3d 622, 636-37 (7th Cir. 2014).

For the reasons discussed below, we conclude that the Access Codes are

coupons under the plain meaning of the word "coupon," the legislative history of

CAFA, and even under the Ninth Circuit's interpretation of the scope of the

28

1   coupon settlement provisions.

2

3           B.      *The Access Codes are Coupons*

4           Isaacson contends that the Access Codes are coupons because they can be

5   used only to start new subscriptions; are valid only for select products or services;

6   and are a "promotional gimmick for which no market exists." Appellant Br. 35.

7   Appellees argue that the Access Codes differ from coupons because they

8   "provide an entire product free of charge, not merely a discount;" "do not require

9   class members to hand over more of their money in order to enjoy the

10  Settlement's benefit;" and "feature a long period of usability and are freely

11  transferrable." Appellee Moses Br. 23 (emphases omitted); *see* Appellee NYT Br.

12  19-22.

13          The Access Codes are coupons under the plain meaning of the word: they

14  are, in substance, digital vouchers that are "surrendered in order to obtain" a

15  one-month subscription to a NYT publication. *Coupon*, Merriam-Webster Third

16  New International Dictionary; *see also In re: Lumber Liquidators*, 952 F.3d at 490

17  (concluding that vouchers that entitled their holders "to obtain discounted or free

18  flooring and flooring-related products . . . are within the generally understood

meaning of a 'coupon'"); *In re Sw. Airlines Voucher Litig.*, 799 F.3d at 706 (vouchers for free drinks on Southwest flights). Contrary to the district court's conclusion that the Access Codes are not coupons because NYT "provides an entire product free of charge," App'x 261, Congress expressly contemplated settlements such as the instant one where the proposed relief "entitle[s] class members to receive something . . . free of charge" when it enacted CAFA's coupon settlement provisions. S. Rep. No. 109-14, at 17, 31-32 (explaining that a settlement that offered "free water to Poland Spring customers" was a coupon settlement); *see also id.* at 17 (free golf balls). That the Access Codes are coupons is consistent with dictionary definitions of the term, and accords with the common understanding of the term to frugal shoppers who use coupons that offer particular products for free, even if such offers are less frequent at the supermarket than coupons that provide a discounted price.

Accordingly, Congress envisioned the plain meaning of the term "coupon" to cover this settlement. But even if we were to take a more restrictive view of the meaning of "coupon" keyed to the presumed legislative purpose of the term as encapsulated by the Ninth Circuit's three-factor guide, our conclusion that the Access Codes are coupons would remain the same.

First, although class members do not expressly "hand over more of their

own money before they can take advantage of" the Access Codes, *In re Online*

*DVD*, 779 F.3d at 951, the Access Codes require class members "to do business

with defendants again in order to redeem the" free one-month subscription, *Roes,*

*1-2*, 944 F.3d at 1052; *see also Does 1-2*, 925 F.3d at 903 (noting that the first factor

weighed in favor of finding that credits were coupons where "the settlement

forces class members to continue doing business with [the] [d]efendants"). By

requiring class members to start a new subscription with NYT to take advantage

of the settlement, class members – however disgruntled they may be with NYT

because of its alleged illegal billing practices – are left two choices: continue

doing business with NYT or obtain a minimal settlement benefit. *See, e.g.*, *Does*

*1-2*, 925 F.3d at 903 (noting that credits which would be "of no value to former

dancers unless they return to work"were coupons). Like the infant crib settlement

that gave Congress pause – where class members who alleged that a company

was selling defective infant cribs received settlement relief of either a crib repair

kit or a $55 coupon to purchase products from the same company, *see* S. Rep. No.

109-14, at 17 – class members in the instant lawsuit "cannot reap the benefits of

the settlement without reengaging in the same [subscription-based] activity that

31

they believe led to their injury," *In re Easysaver Rewards Litig.*, 906 F.3d at 757. In other words, the free subscriptions are "only valuable for consumers who plan to [have a new NYT subscription] and still trust the company." S. Rep. No. 109-14, at 20 (noting coupon settlement that offered "coupons to use with Register.com (assuming [the class members] ever plan to register one of the company's domains again)"). Thus, the first factor weighs in favor of concluding that the Access Codes are coupons.

Second, the Access Codes are valid only "for select products or services." *In re Online DVD*, 779 F.3d at 951. The Access Codes neither provide class members with the option to extend their current subscription nor the option to select what product they prefer from the entire catalogue of NYT offerings. *See* S. Rep. No. 109-14, at 16 (settlement that provided a discount on "selected products" was a coupon settlement). The range of products available to class members is considerably smaller than those in *McKinney-Drobnis*, 16 F.4th at 605, where the Ninth Circuit concluded that a $36.28 voucher that could be used to purchase more than 250 health and wellness products at Massage Envy was a coupon. There, the court noted that "[t]he limited range of products and services available at Massage Envy, even considering the breadth offered within the

product category, favors viewing the vouchers as coupons under CAFA." *Id.*; *see*

*also In re: Lumber Liquidators*, 952 F.3d at 490 (concluding that vouchers, which can

be used only to purchase flooring and flooring tools were coupons). In this case,

NYT offers a "limited universe" of products to subscribers to begin with, *In re*

*Easysaver Rewards Litig.*, 906 F.3d at 757, and the settlement further restricts the

universe of products that class members are entitled to obtain via Access Codes

based on their subscription status. *See Berkson v. Gogo LLC*, 147 F. Supp. 3d 123,

129 (E.D.N.Y. 2015) (concluding that promotional codes for free WiFi service were

coupons subject to CAFA's relevant provisions where the length of free use

awarded varied by class member).

The limited applicability of the Access Codes suggests that, rather than

sanctioning NYT for the company's alleged violation of the ARL, they provide a

"promotional opportunity and not a penalty" to NYT. S. Rep. No. 109-12, 15. The

redemption of the Access Codes has the potential to increase NYT's subscriber

base by "driving traffic." *Id.* at 16. As was the case in *Wilson v. Directbuy, Inc.* –

where a district court concluded that a settlement, which offered continued or

renewed membership at a retail store was a coupon settlement – NYT receives "a

clear benefit by maintaining its members for as long as possible" and the

settlement "might well result in an increase in [its] membership base."

No. 09-CV-590, 2011 WL 2050537, at *6 (D. Conn. May 16, 2011). For example,

NYT might convince an Inactive class member to return to NYT or an Active class

member to enroll in a secondary subscription to NYT Cooking or Games that they

would otherwise have passed upon. *See, e.g.*, S. Rep. No. 109-14, at 16 (noting that

settlement, which provided discounts for a cruise was a "promotional

opportunity" for the defendant).

Moreover, the Access Codes provide limited utility to class members who

claim that they have been harmed by NYT's challenged practices. Given that the

premise of the ARL underlying the class action claims is that automatic renewals

risk ensnaring subscribers into unwanted extensions, *see* Cal. Bus. & Prof. Code §

17600 (noting "the intent of the [l]egislature to end the practice of ongoing

charging of consumer . . . accounts without the consumers' explicit consent"),

Inactive class members – those "who do not currently have any active NYT

subscription," App'x 119 – are presumably persons who have decided they do not

want to subscribe, and have taken affirmative steps to extricate themselves. The

offer of a free one-month subscription is likely to be of little or no value to such

class members.

Similarly, Fully Active class members – those who are entitled to access "all of NYT's digital [s]ubscription offerings," *id.* – have no use for a second subscription and are barred from using the Access Codes to pay for one month of their existing subscription. And Active class members – those who already subscribe to one or more (but not all) of NYT's offerings – have presumably already made an election as to which products they want and those they simply do not. The lure of a trial subscription to NYT Cooking or NYT Games seems to "operate more as a promotional campaign, as is somewhat common among coupon settlements" than a benefit to such a selective subscriber. *Reed v. Continental Guest Servs. Corp.*, No. 10-CV-5642, 2011 WL 1311886, at *3 (S.D.N.Y. Apr. 4, 2011) (concluding that a settlement offering free and discounted posters was a coupon settlement). Thus, the second factor weighs in favor of concluding that the Access Codes are coupons.

Third, although the Access Codes do not expire for at least fifty years and may be transferred, they are somewhat inflexible. *See In re Easysaver*, 906 F.3d at 755 (considering whether non-cash relief is a coupon in light of whether it is

flexible, *i.e.*, it "expires or is freely transferrable"). The Ninth Circuit's third factor

is designed to mitigate the improper application of CAFA's coupon settlement

provisions to settlements that may fail the first two factors but were outside

Congress's purview when it enacted the statute. A settlement that provides relief

that arguably meets the dictionary definition of "coupon" and is redeemable only

to obtain more products from a defendant may generate less skepticism the closer

the relief approaches the utility of cash. Thus, in *In re Online DVD-Rental Antitrust*

*Litigation*, the Ninth Circuit held that a $12 Walmart gift card, while not a precise

cash equivalent, was arguably more valuable than the traditional coupon: The

range of products available, accessability of a nationwide chain of stores, and

online shopping capacity made it likely that recipients of such a gift card could

easily utilize the card to obtain a product they actually wanted. 779 F.3d at 950-

51. And if a recipient could not, the gift card could likely be transferred at close to

face value. *Id.* at 951.

The Access Codes, in contrast, "cannot be used in anywhere near the same

way as cash – including because they cannot be used [in the manner in] which

people would be most interested in using them" – to extend subscriptions. *In re*

*Easysaver*, 906 F.3d at 757. In *Does 1-2*, the Sixth Circuit concluded that settlement

relief, which "impos[ed] [similarly] severe restrictions on the redemption of . . .

credits," including "limits on possible recovery based on the length of time a

class member has worked" was "much less flexible than the gift cards and

vouchers found to fall outside CAFA's reach." 925 F.3d at 903. As discussed

above, the restrictive nature of the Access Codes renders them worthless for

many class members, and the face value of NYT's products ("a value of $3-$5,

depending on the subscription," App'x 121) is so low that a potential transferee

has little incentive to buy an Access Code from a class member rather than

purchase a subscription from NYT directly. It is no surprise, therefore, that "there

is no evidence that a secondary market for [Access Codes] exists."

*McKinney-Drobnis*, 16 F.4th at 605; *see also Redman*, 768 F.3d at 628 (noting that

"the secondary market in coupons is bound to be thin," at least in part because of

"the bother of going online to buy $10 coupons at small discounts"). Thus, the

third factor of the Ninth Circuit's test does not favor the proponents of the

settlement.[6] The Access Codes, accordingly, are coupons even under the Ninth

---

[6] Any claim that the Access Codes are comparable to cash is further belied by the
fact that class counsel did not elect to take any of their own compensation in the

1    Circuit's three-factor test.[7]

2        Finally, contrary to Appellees' argument, the availability of optional cash

3    relief based on a timely claim does not shift the ball. Our sister circuits have

4    generally recognized CAFA's "coupon" settlement provisions as applicable to

5    settlements awarding both cash and coupon relief, *see In re: Lumber Liquidators*,

6    952 F.3d at 491; *In re Easysaver Rewards Litig.*, 906 F.3d at 759 n.11; *In re Sw.*

---

1  form of coupons. *Cf.* S. Rep. No. 109-14, at 30 (2005) (noting that CAFA's coupon
2  settlement provisions are aimed at situations where class members receive
3  coupons but attorneys are paid "in cash, not coupons" (internal quotation marks
4  omitted)). It is inconceivable that any attorney would opt for the coupons as
5  compensation because no reasonable person would consider the coupons as
6  equivalent to cash.

1  [7] Appellees' reliance on our non-precedential summary order in *Blessing v. Sirius*
2  *XM Radio Inc.*, 507 F. App'x 1 (2d Cir. 2012) is misplaced. In *Blessing*, the parties
3  entered into a settlement agreement, which provided class members with a
4  month subscription to the defendant's internet radio service and a subscription
5  price-freeze. After the terms of the settlement agreement were reached, the
6  parties negotiated the attorneys' fees and agreed that the fees come directly from
7  the defendant, "rather than from funds (or coupons) earmarked for the class." *Id.*
8  Although the district court found that the settlement was not subject to CAFA's
9  coupon settlement provision, *see Blessing v. Sirius XM Radio Inc.*, 09-CV-10035,
10  2011 WL 3739024, at *2 (S.D.N.Y. Aug. 24, 2011), on appeal, we did not opine on
11  the definition of "coupon," 507 F. App'x at 4. Rather, we noted that even if the
12  settlement included coupons, no portion of the attorneys' fee award was
13  attributable to the award of the coupons. Thus, the attorneys' fee calculation was
14  not subject to CAFA. *Id.* at 5, citing 28 U.S.C. § 1712(b), (c)(2).

*Airlines Voucher Litig.*, 799 F.3d at 710, and have rejected the argument that

CAFA's coupon settlement provisions do not apply to a settlement that provides

class members with the option to receive cash payments in lieu of coupons, *see*

*McKinney-Drobnis*, 16 F.4th at 611; *Does 1-2*, 925 F.3d at 893; *see also Copley v.*

*Bactolac Pharm., Inc.*, No. 18-CV-00575, 2023 WL 2470683, at *8 (E.D.N.Y. Mar. 13,

2023). Keeping with CAFA's directive that § 1712 applies to "a proposed

settlement under which class members would be awarded coupons," 28 U.S.C.

§ 1712(e), we are disinclined to adopt a position that exempts a settlement which

awards coupons from § 1712's requirements simply because class members may

opt out for cash.[8] *See In re: Lumber Liquidators*, 952 F.3d at 491 (rejecting the same

argument because to hold otherwise "would defeat CAFA's purpose of exacting

scrutiny of 'coupon' settlements and permit parties to perform an end run around

---

[8] Even assuming arguendo that under some circumstances, a settlement that
provides a meaningful cash alternative to a coupon could escape the strictures of
CAFA's coupon settlement provisions, this is not such a case. Here, unlike in *In re
Online DVD-Rental Antitrust Litigation*, 779 F.3d at 950, where class members
could opt for $12 in cash instead of the $12 Walmart gift card, the cash option
does not provide claimants with a fixed amount of money but a *pro rata* share of
the Settlement Fund – or more accurately of what remains of the Settlement Fund
after attorneys' fees, the incentive award, and the potentially substantial
administrative expenses of the settlement are paid.

CAFA by including a nominal cash award as a settlement term").

In sum, the district court erred in concluding that the Access Codes were not coupons, which subject the attorneys' fee calculation to CAFA's coupon settlement provisions.[9]

## IV.    Incentive Award

Isaacson next challenges the district court's approval of a $5,000 incentive award to Moses as the class representative. In support, Isaacson contends that Supreme Court precedents from the nineteenth century, *Trustees v. Greenough*, 105 U.S. 527 (1881) and *R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885), prohibit such incentive awards because they create a conflict of interest between Moses and other class members.

Rule 23(e)(2)(D) directs courts to approve a settlement proposal only if it "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D).

---

[9] That the district court cross-checked the attorneys' fees against the lodestar amount does not persuade us otherwise because the nominal value of the Access Codes, as opposed to their redemption value, impermissibly informed the district court's calculation. *See* 28 U.S.C. § 1712(a); *Does 1-2*, 925 F.3d at 904 ("Nor is the fee award saved by the fact that the district court cross-checked the fee against the lodestar, because the district court's ultimate calculation assumed the [nominal] total settlement value.").

1   That mandate is harmonious with, and promoted by, our clear precedent that

2   permits district courts to approve fair and appropriate incentive awards to class

3   representatives. *See Melito*, 923 F.3d at 96; *see also Fikes Wholesale, Inc. v. HSBC*

4   *Bank USA, N.A.*, 62 F.4th 704, 721 (2d Cir. 2023); *Hyland*, 48 F.4th at 124.

5       Incentive awards encourage class representatives to participate in class

6   action lawsuits, which are "designed to provide a mechanism by which persons,

7   whose injuries are not large enough to make pursuing their individual claims in

8   the court system cost efficient, are able to bind together with persons suffering

9   the same harm and seek redress for their injuries." S. Rep. No. 109-14, at 5; *see also*

10  1 Joseph McLaughlin, McLaughlin on Class Actions § 1:1 (19th ed. 2022)

11  (narrating the historical purposes of incentive awards); *Johnson v. NPAS Sols.,*

12  *LLC*, 43 F.4th 1138, 1145 (11th Cir. 2022) (Pryor, *J.*, dissenting from the denial of

13  rehearing en banc) (same). Such incentive awards often level the playing field

14  and treat differently situated class representatives equitably relative to the class

15  members who simply sit back until they are alerted to a settlement. *See supra*

16  Section II.B.

17      Accordingly, an overwhelming majority of our sister circuits have

concluded that district courts are permitted to grant incentive awards. *See*

*Murray*, 55 F.4th at 353; *In re Apple Inc. Device Performance Litig.*, 50 F.4th at 785-86;

*Jones v. Singing River Health Servs. Found.*, 865 F.3d 285 (5th Cir. 2017) (vacating a

class action settlement with an incentive award on other grounds and affirming

the same settlement after district court provided further explanation in 742 F.

App'x 846 (5th Cir. 2018)); *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 867 (8th Cir.

2017); *Pelzer v. Vassalle*, 655 F. App'x 352, 361 (6th Cir. 2016); *Tennille v. W. Union

Co.*, 785 F.3d 422, 434-35 (10th Cir. 2015); *Berry v. Schulman*, 807 F.3d 600, 613-14

(4th Cir. 2015); *Cobell v. Salazar*, 679 F.3d 909, 922-23 (D.C. Cir. 2012); *Sullivan v.

DB Invs., Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011) (en banc); *In re Synthroid Mktg.

Litig.*, 264 F.3d 712, 722 (7th Cir. 2001). Only recently in *Johnson v. NPAS Sols.,

LLC*, 975 F.3d 1244 (11th Cir. 2020) did the Eleventh Circuit depart from this

previously universally accepted consensus and create a circuit split by adopting

an "outlier rule [that] potentially undermines th[e] purpose [of class actions] and

threatens the viability of consumer class actions." *Johnson*, 43 F.4th at 1151 (Pryor,

J., dissenting).

      In *Johnson*, the Eleventh Circuit held that incentive awards in class actions

are unlawful *per se*, regardless of whether the parties and the district court agree that the award is fair and appropriate. 975 F.3d at 1244, 1256. Although the court acknowledged that the equitable trust principles that applied to the compensation of creditors from a common fund in the nineteenth century was only "roughly analogous" to the metrics for the compensation of class members under Rule 23 today, the court concluded that *Greenough* and *Pettus*, Supreme Court precedents from over 140 years ago, precluded incentive awards. *Id.* at 1257.

Isaacson argues that we should adopt the Eleventh Circuit's approach and reverse our established precedent. We decline to depart from Rule 23's mandate, which permits fair and appropriate incentive awards. *See supra* Section II.B. Neither *Greenough* nor *Pettus* compel a different conclusion.

In *Greenough*, a railroad bondholder brought suit on behalf of himself and other bondholders against trustees of a fund that had engaged in transactions that affected the values of their bonds. After obtaining a favorable judgment, the district court approved the bondholder's request for attorneys' fees, litigation

expenses, personal fees for his travel associated with the lawsuit, and a ten-year

allowance. The Supreme Court affirmed the attorneys' and litigation fees but

reversed the personal fees and allowance, which was analogous to "a salary" and

had totaled more than $1.4 million in today's dollars.[10]  105 U.S. at 537-38.

In vacating the bondholder's compensation, the Supreme Court explained

that, unlike the attorneys' and litigation fees which were authorized under

common law trust principles, there was "no authority whatever" that sanctioned

a named plaintiff's compensation award. *Id.* at 537. The Court declined to create

such compensation under common law for fear that it would "present too great a

temptation to parties to intermeddle in the management of valuable property or

funds." *Id.* at 538.

A few years later, in *Pettus*, without further opining on the compensation of

class representatives, the Supreme Court concluded that attorneys could present

independent claims for compensation from a common fund that was recovered on

---

[10] *See* Consumer Price Index, 1800-, Federal Reserve Bank of Minneapolis (last visited July 31, 2023), https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1800- (noting that official U.S. data for a Consumer Price Index ("CPI") goes back to 1913 and that $1 in 1913 dollars is worth $30.72 in 2023 dollars based on the CPI).

behalf of their clients. 113 U.S. at 125.

Greenough and Pettus have been superseded, not merely by practice and usage, but by Rule 23, which creates a much broader and more muscular class action device than the common law predecessor that spawned the nineteenth-century precedents. Today – unlike in the nineteenth century when there was "no authority whatever" that guided the compensation of litigants in common fund cases, Greenough, 105 U.S. at 537, and courts were confined to the application of federal general common law and equitable principles – there is no longer "federal general common law," Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938), and we are bound by the framework of Rule 23 in modern class actions, Hyland, 48 F.4th at 123-24. Neither Greenough nor Pettus examined "a class action settlement and obviously could not rely on the revised Rule 23, which would not exist for another 85 years. And so, of course, Greenough is silent as to whether Rule 23 allows a court to approve an incentive award." Johnson, 43 F.4th at 1148 (Pryor, J., dissenting); see also In re Apple Inc. Device Performance Litig., 50 F.4th at 785-86 (rejecting argument that Greenough and Pettus prohibit incentive awards); Murray, 55 F.4th at 352-53 (same).

1          Given historical developments, the Supreme Court appears to have left

2     *Greenough* and *Pettus* in the rear view. More recently, without reference to either

3     case, the Supreme Court acknowledged that a class representative "might receive

4     a share of class recovery above and beyond her individual claim." *China Agritech,*

5     *Inc. v. Resh*, --- U.S.---, 138 S. Ct. 1800, 1811 n.7 (2018), citing *Cook v. Niedert*, 142

6     F.3d 1004, 1016 (7th Cir. 1998) (affirming a class representative's $25,000 incentive

7     award); *see also* 5 Newberg and Rubenstein on Class Actions §§ 17:2, 17:4

8     (explaining that *Greenough* "seems distant in both time and fact").

9          Indeed, despite the long history of incentive awards post-*Greenough* and

10    *Pettus*, and several iterations of statutes and Rules, neither Congress nor the

11    Advisory Committee on Federal Rules of Civil Procedure has suggested (yet

12    alone imposed) a blanket prohibition on incentive awards. *See* Thomas E.

13    Willging, et al., *An Empirical Analysis of Rule 23 To Address the Rulemaking*

14    *Challenges*, 71 N.Y.U. L. Rev. 74, 101 (1996) (reviewing empirical data on incentive

15    awards collected on behalf of the advisory committee); Private Securities

16    Litigation Reform Act, 15 U.S.C. § 78u-4(a)(2)(A), (a)(4) (prohibiting incentive

17    awards in securities class action settlements). Rather, in CAFA, Congress

addressed its reservations concerning settlements where "*unjustified* awards are made to certain plaintiffs at the expense of other class members" who "receive little or no benefit." Pub. L. No. 109-2, § 2, 119 Stat. 4 (2005) (emphasis added).

Such unjustified incentive awards – more aptly analogized to a salary – exceed the amount necessary to serve their purpose, exemplify Congress' concerns, and create the very conflict between class representatives and other class members that *Greenough* and *Pettus* sought to prevent.[11] *See supra* Section II.B. But we cannot say that incentive awards are *per se* improper.[12]

---

[11] To the extent Isaacson argues that incentive awards should be prohibited because attorneys may be incentivized to pursue frivolous class actions in order to obtain attorneys' fees, those concerns are more appropriately addressed in the determination of attorneys' fee awards, and not the incentive awards for class representatives.

[12] To be clear, we do not opine on whether Moses' incentive award is excessive. On remand, if the present settlement is disapproved and a new settlement agreement comes before the district court, the district court has the discretion to reevaluate whether an incentive award is appropriate in light of Moses's contributions to the case. *See also Melito*, 923 F.3d at 96 (affirming $2,500 incentive awards); *Johnson*, 43 F.4th at 1150 (*Pryor, J.*, dissenting) (noting a "near-universal recognition that it is appropriate for the court to approve an incentive award payable from the class recovery, usually within the range of $1,000-$20,000" (internal quotation marks omitted)). For the moment, however, we are presented with no argument that the award was excessive, but only with Isaacson's argument that such awards are categorically prohibited. We therefore identify no error in the incentive award that would independently require any further action

In sum, we reiterate that neither *Greenough* nor *Pettus* prohibits incentive awards in class actions, and that providing incentive payments to class representatives for their role in advancing litigation is, on its own, insufficient to create a conflict of interest. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 943 ("Incentive payments to class representatives do not, by themselves, create an impermissible conflict between class members and their representatives.").

## V.  Overall Settlement Approval

Appellees argue that the order approving the settlement should be upheld even if the attorneys' fee calculation is subject to CAFA's coupon settlement provisions because "the validity of the Settlement is not contingent upon approval of the amount of attorneys' fees, per the agreement's own terms" and, in any event, the district court "complied with CAFA's requirements for court approval of a coupon settlement." Appellee NYT Br. 17. We disagree.

Although the Settlement Agreement states that the court's failure to approve attorneys' fees does not terminate the settlement, the revised Rule 23(e) requires courts to "tak[e] into account . . . the terms of any proposed award of

_____

by the district court in the absence of the other errors that require vacatur of the district court's approval of the settlement.

1  attorney's fees" prior to approving a settlement. Fed. R. Civ. P. 23(e)(2)(C)(iii).

2  The district court neither evaluated the settlement in light of the fee awards nor

3  complied with CAFA's coupon settlement requirements when it awarded

4  attorneys' fees based on the face value of the Access Codes. On remand, the

5  district court must apply those provisions in determining the appropriate

6  attorneys' fee award.

7      The consequences of the district court's latter error are not only fatal to the

8  approval of the attorneys' fee award, but extend to the court's determination of

9  whether the settlement terms were fair, reasonable, and adequate as required by

10  Rule 23(e)(2). It may be that even if the attorneys' fee award provided in the

11  Settlement Agreement is ultimately determined to be excessive when calculated

12  pursuant to CAFA's coupon settlement provisions, the relief provided to the class

13  members is appropriate. Although a more rigorous examination of the

14  redemption value of the Access Codes may result in a significant reduction in its

15  purported value, it is also possible that a similarly rigorous examination of the

16  merits of the case and the actual harm suffered by the class members would lead

17  the court to conclude that the relief provided to the class members nevertheless

18  fairly apportioned any likely recovery that would have been obtained had the

case proceeded to conclusion. *See* S. Rep. No. 109-14, at 31-32 (clarifying that Congress "does not intend to forbid all non-cash settlements" as coupon "settlements may be appropriate where they provide real benefits to consumer class members . . . or where the claims being resolved appear to be of marginal merit"). In light of the district court's examination of the settlement, however, we simply cannot assume that such would be the case.

Moreover, the flawed attorneys' fee award is closely tied to the valuation of the settlement. The district court found that the fee award was reasonable because, as compared to the purported face value of the Access Codes and the resulting inflated value of relief obtained by the class, it represented a reasonable contingency fee recovery (22.5% of the total face value of the settlement). Given that a fair evaluation of the redemption value of the Access Codes, many of which are unlikely to be redeemed – *see* 28 U.S.C. § 1712(a) (providing that "the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed") – is likely far lower than the face value attributed in the district court's calculation, a critical predicate to the district court's evaluation of the reasonableness of the settlement is fatally undermined.

1        For the reasons set forth above, we vacate and remand the district court's

2      order approving the settlement and the attorneys' fees. In reaching our

3      conclusion, we do not opine on the fairness of the settlement. Nor do we suggest

4      that the district court must overturn the settlement. On remand, the district court

5      is simply directed to recalculate the attorneys' fees pursuant to 28 U.S.C. § 1712

6      and evaluate the settlement in light of Rule 23's appropriate legal standard.

**CONCLUSION**

8        We have considered Appellees' other arguments and conclude that they are

9      without merit. Thus, for the foregoing reasons, we **VACATE** the district court's

10     judgment and **REMAND** the case to the district court for further proceedings

11     consistent with this opinion.

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2023, I am electronically filing the foregoing document with the Clerk of the United States Court of Appeals for the Second Circuit using the CM/ECF system, which will provide notification of such filing to all parties and their counsel who are ECF-registered filers.

Date: August 31, 2023

            /s/ Eric Alan Isaacson
          ERIC ALAN ISAACSON